# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| SYLEBRA CAPITAL PARTNERS MASTER FUND, LIMITED and P SYLEBRA LTD., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **C.A. No. 2019-0843-JRS** |
| RONALD O. PERELMAN, KEVIN M. SHEEHAN, M. GAVIN ISAACS, RICHARD M. HADDRILL, PETER A. COHEN, DAVID L. KENNEDY, PAUL M. MEISTER, MICHAEL J. REGAN, BARRY F. SCHWARTZ, FRANCES F. TOWNSEND, VIET D. DINH, GERALD J. FORD, GABRIELLE K. MCDONALD, SCIENTIFIC GAMES CORPORATION, BALLY GAMING, INC. and MACANDREWS & FORBES INCORPORATED, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: July 30, 2020
Date Decided: October 9, 2020

Samuel T. Hirzel II, Esquire and Gillian L. Andrews, Esquire of Heyman Enerio Gattuso & Hirzel LLP, Wilmington, Delaware and Patrick J. Smith, Esquire, Andrew J. Rodgers, Esquire and Nicholas J. Karasimas, Esquire of Smith Villazor LLP, New York, New York, Attorneys for Plaintiffs.

William M. Lafferty, Esquire, Susan W. Waesco, Esquire and Alexandra M. Cumings, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Kevin J. Orsini, Esquire and Rory A. Leraris, Esquire of Cravath, Swaine & Moore LLP, New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

Minority stockholders of a Nevada corporation, Scientific Games Corporation ("Scientific Games" or the "Company"), have sued the Company's controlling stockholder and members of its allegedly "handpicked" board of directors for breaches of fiduciary duty and violations of the Delaware General Corporation Law ("DGCL"). The Company's bylaws contain a provision that requires stockholders to bring claims for breach of fiduciary duty in the courts of Clark County, Nevada. And the claims at issue here are implicated by a first-filed action brought by the Company against the minority stockholders in, of all places, Nevada.

Right out of the gate, this picture ought to provoke questions, even upon a terse glance. Why are stockholders of a Nevada corporation invoking the DGCL? Why are these stockholders suing fiduciaries of a Nevada corporation in Delaware? In doing so, why are they asking a Delaware court to ignore a mandatory forum selection clause in this Nevada corporation's by-laws? And why haven't they asserted these claims in the first-filed Nevada action?

According to the Delaware plaintiffs, to answer these questions, one must first take a brief sally down memory lane. Scientific Games has not always been chartered in Nevada. Before it relocated to Nevada in January 2018, the Company called Delaware home. The plaintiffs here invested in the Company when it was organized under Delaware law. And the conduct giving rise to the claims in this action—which involve an alleged scheme to force plaintiffs to redeem their

1

Scientific Games shares at less than fair value—began when the defendants owed fiduciary duties to a Delaware corporation and its stockholders at a time when the Company was subject to the DGCL.  Thus, say plaintiffs, the picture is more nuanced than it first appears and they have properly asserted their claims in Delaware.

Defendants respond that, notwithstanding plaintiffs' attempt to create abstract art with creative pleading, the image of a misplaced lawsuit still shines through the prolix.  According to Defendants, plaintiffs would have this Court adjudicate their claims, even though: (1) plaintiffs seek to invalidate provisions of Delaware constitutive documents that no longer exist and have not existed for more than two years; (2) plaintiffs were stockholders at the time Scientific Games left Delaware for Nevada, yet at no time before now have they challenged that move or sought to pursue their supposed Delaware claims; (3) plaintiffs' claims require the Court to decide whether provisions in the constitutive documents of a Nevada corporation are enforceable; (4) the Company's mandatory Nevada forum selection bylaw is broad and unambiguously covers plaintiffs' supposed Delaware claims; and (5) there is a first-filed action pending in Nevada before a court that is fully capable of adjudicating all claims between these parties.

Defendants have moved to dismiss.  For reasons that follow, the motion must be granted.

# I. BACKGROUND

I have drawn the facts from the Verified Amended Complaint and documents incorporated by reference or integral to that pleading.[1]  For purposes of the motion, I accept as true the Amended Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiffs' favor.[2]

## A. The Parties

Plaintiffs, Sylebra Capital Partners Master Fund, Limited ("Sylebra Capital") and P Sylebra Ltd. (collectively with Sylebra Capital, "Sylebra"), are a Cayman Islands-based investment fund and a British Virgin Islands-based advisory client, respectively.[3]  Taken together, the Sylebra plaintiffs and another Sylebra-advised entity were, at all relevant times, Scientific Games' second largest stockholder.[4]

Defendant, Scientific Games, "is a publicly traded corporation organized and existing under the laws of the State of Nevada."[5]  The Company was a Delaware corporation until January 10, 2018, when it "re-domesticated" to Nevada, the state

---

[1] Verified Am. Compl. ("Compl.") (D.I. 23); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a Motion to Dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[2] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[3] Compl. ¶¶ 22–23.

[4] Compl. ¶ 3.

[5] Compl. ¶¶ 4, 27.

where it has maintained its principal place of business since inception.[6] Scientific Games operates in the lottery and gaming industry. Defendant, Bally Gaming, Inc. ("Bally"), is an indirect wholly-owned operating subsidiary of the Company, also incorporated in Nevada.[7]

Defendant, MacAndrews & Forbes, Inc., is a holding company formed and wholly owned by Defendant, Ronald Perelman, to "own and operate a diverse array of businesses."[8] Scientific Games is a MacAndrews & Forbes portfolio company.[9] Perelman, through MacAndrews & Forbes, beneficially owned 39% of the Company's outstanding common stock and was the Chairman of its board of directors (the "Board") throughout the events described in the Complaint.[10]

Defendants, Kevin M. Sheehan, M. Gavin Isaacs, Richard M. Haddrill, Peter A. Cohen, David L. Kennedy, Paul M. Meister, Michael J. Regan, Barry F. Schwartz, Frances F. Townsend, Viet D. Dinh, Gerald J. Ford and Gabrielle K. McDonald are each current or former officers or directors of the Company.[11] Sylebra

---

[6] *Id.*

[7] Compl. ¶ 28.

[8] Compl. ¶ 26.

[9] *Id.*

[10] Compl. ¶ 29.

[11] Compl. ¶¶ 30–41.

alleges each of these defendants are beholden to Perelman and facilitated his breaches of fiduciary duty, as described below.

### B. Suitability Requirements, Article Tenth and the Redemption Standard

Sylebra first acquired stock in Scientific Games in early 2015.[12] By February 2017, Sylebra owned 8,619,044 shares (or 9.84%) of the Company's Class A Common Stock.[13]

As gaming companies, both Scientific Games and Bally are subject to numerous "licensure [requirements] and regulations" "across multiple jurisdictions."[14] These regulations include so-called "suitability" requirements that apply to the Company's investors.[15] Since this was Sylebra's first foray as an investor in the gaming industry, it was particularly sensitive to the "suitability" requirements and worked diligently with the Company to ensure that it complied with the regulations in all jurisdictions where the Company operated.[16] At first, the

---

[12] Compl. ¶ 63.

[13] *Id.*

[14] Compl. ¶ 64.

[15] "Suitability" regulations generally require companies in the gaming industry to ensure that their investors are not engaged in or associated with illegal or illicit activity. Compl. ¶ 4. If a company violates suitability regulations, the company risks losing its gaming licenses. Compl. ¶ 78.

[16] Compl. ¶ 65.

5

Company was ready and willing to assist.[17]  Happy to receive Sylebra's investment, the Company gave Sylebra no reason to be concerned that its structure, investment base or investment portfolio would run afoul of any suitability requirement.[18]

In April 2017, at Perelman's bidding, the Company began to question Sylebra's investment in a company called Qiwi plc ("Qiwi").[19]  The questions followed a 2015 *New York Times* article, where it was reported that pro-Russian groups were illegally utilizing payment terminals owned by Qiwi to fund the war in eastern Ukraine.[20]  While the Company expressed alarm that Sylebra would invest in a company like Qiwi, government authorities apparently did not share that alarm as none took any action against Qiwi in response to the 2015 article.[21]  Thus, from Sylebra's perspective, the Company's questions were pretext for Perelman's effort to drive out an investor that posed "a threat to [Perelman's] total command over Scientific Games."[22]

---

[17] *Id.*

[18] *Id.*

[19] Compl. ¶¶ 66–70.

[20] Compl. ¶ 68.

[21] *Id.*

[22] Compl. ¶ 66.

On April 27, 2017, unbeknownst to Sylebra, the Company ratcheted its questions into action when it alerted numerous gaming regulators of Sylebra's investment in Qiwi.[23] According to Sylebra, the Company took this step so it could invoke "Article Tenth" of its then-operative Amended and Restated Articles of Incorporation (the "Delaware Charter").[24] Article Tenth, in relevant part, provided that, "all Securities of the [Company] shall be held subject to the suitability standards . . . of the [g]aming [a]uthorities."[25] It then laid out criteria by which the Company could deem that a stockholder was a "Disqualified Holder":

> any holder of the [Company's] Securities (1) who is requested or required . . . to . . . submit to the jurisdiction of, or provide information to, any [g]aming [a]uthority and either refuses to do so or otherwise fails to comply with such request or requirement within a reasonable period of time, (2) who is determined or shall have been determined by any [g]aming [a]uthority not to be suitable . . . or (3) whose holding of Securities may result, in the judgment of the Board of Directors, in the failure of the [Company] or any Affiliate to obtain, maintain, renew or qualify for a license, contract, franchise or other regulatory approval with respect to the operation or conduct of the business of the [Company] . . . or any of its Affiliates from a [g]aming [a]uthority which conditions approval upon holders of the [Company's] Securities possessing prescribed qualifications.[26]

---

[23] Compl. ¶¶ 70, 79–80.

[24] Compl. ¶ 71; Transmittal Aff. of Riley T. Svikhart to the Opening Br. in Supp. of the Defs.' Mot. to Dismiss Pls.' Verified Compl. ("Svikhart Aff."), Ex. 8 ("Delaware Charter").

[25] Compl. ¶ 72; Delaware Charter, at 3.

[26] Compl. ¶ 73. Delaware Charter, at 4.

If the Board deemed any stockholder to be a Disqualified Holder, then the Company could require the Disqualified Holder either to divest its interest within sixty days or, more relevant here, allow the Company to redeem the Disqualified Holder's stock at a specified "Redemption Price."[27]  The Redemption Price was defined as:

> a price equal to the lesser of (1) the average closing sale price of such Securities as reported for composite transactions in securities listed on the principal trading market on which such Securities are then listed or admitted for trading during the 30 trading days preceding the Notice Date or, if such Securities are not so listed or traded, at the fair value of the Securities determined in good faith by the Board of Directors and (2) the holder's original Purchase Price.[28]

Numerous regulators took the bait set by the Company and contacted Sylebra to inquire about its relationship with Qiwi.[29]  Most notably, the Office of Enforcement Counsel of the Pennsylvania Gaming Control Board (the "Pennsylvania Regulator") and the U.S. Virgin Islands Casino Control Commission ("Virgin Islands Regulator") both initiated investigations of Sylebra's suitability.[30]

---

[27] Compl. ¶¶ 76–77; Delaware Charter, at 4.

[28] Compl. ¶ 77; Delaware Charter, at 4.

[29] Compl. ¶ 8.

[30] Compl. ¶ 81.

## C. The Pennsylvania and Virgin Islands Investigations

On April 27, 2017, the Pennsylvania Regulator informed the Company that it had "determined that Sylebra . . . need[ed] to file a Principal Entity License . . . in order that a determination [could] be made as to Sylebra's suitability to maintain its association with Slot Machine Manufacturer Licensee Bally Gaming, Inc. and its affiliate Scientific Games."[31]  Prior to this date, Sylebra was granted "institutional investor status" by the Pennsylvania Regulator, allowing it to bypass the Principal Entity Licensing requirements.[32]  Pending completion of its investigation, the Pennsylvania Regulator restricted Sylebra's ability to divest its Scientific Games shares without permission.[33]

The following day, on April 28, the Company instructed Goldman Sachs to freeze Sylebra's investment to prevent divestment.[34]  A few days later, on May 1, the Company sent a letter to Sylebra informing it of the Pennsylvania Regulator's demands regarding licensing and divestment.[35]  The Company made similar

---

[31] Compl. ¶ 84.  Although not entirely clear from the Complaint, it appears the process of obtaining a Principal Entity License includes an investigation into the applicant's fitness for licensure.  Compl. ¶¶ 88, 90.

[32] Compl. ¶ 85.

[33] Compl. ¶ 86.

[34] Compl. ¶ 87.

[35] Compl. ¶ 88.

demands in its own right, and requested that Sylebra identify "all record holders of shares under Sylebra's management."[36] Sylebra responded by informing the Company that it was in discussions with the Pennsylvania Regulator and had no intention of divesting its Scientific Games stock.[37]

On May 15, 2017, the Pennsylvania Regulator confirmed that Sylebra had divested a majority of its shares in Qiwi, but also confirmed that the investigation was still open pending Sylebra's final divestiture of all Qiwi stock and its satisfactory explanation of the fund's structure.[38] On June 21, 2017, the Pennsylvania Regulator lifted its restrictions on Sylebra's ability to divest its stock in the Company.[39] Unfortunately, Sylebra's regulatory woes did not end there.

One day after the Pennsylvania Regulator lifted its trading restriction, the Virgin Islands Regulator issued a directive restricting Sylebra's ability to divest its shares in the Company pending a suitability investigation of its own.[40] This directive was issued by the Chairman of the Virgin Islands Regulator, Violet Anne Golden ("Chair Golden"), citing to both a letter from the Company in which it detailed the

---

[36] *Id.*

[37] Compl. ¶ 90.

[38] Compl. ¶ 91.

[39] Compl. ¶ 92.

[40] Compl. ¶ 103.

Board's concerns, dated June 2, 2017, and Sylebra's investment in Qiwi, as the bases for the directive.[41]

In a strange twist, Chair Golden directed "Sylebra to tender $75,000 to the Virgin Islands Regulator" to conduct a suitability investigation.[42] Sylebra reluctantly complied. It later discovered that only a small portion of its $75,000 was used to pay for the suitability investigation.[43] Not coincidentally, Chair Golden was later indicted on federal charges of embezzlement, conspiracy, wire fraud and obtaining money under false pretenses.[44]

On January 13, 2020, the Virgin Islands Regulator "lifted the trading restriction directive with immediate effect" after it reviewed the circumstances giving rise to the directive "following Chair Golden's admission of guilt."[45] Bally immediately filed a motion for reconsideration, seeking a hearing and maintenance of the divestiture restriction.[46] This regulatory investigation remains in limbo.

---

[41] Compl. ¶ 106.

[42] Compl. ¶ 108.

[43] Compl. ¶ 111.

[44] *Id.*

[45] Compl. ¶ 114.

[46] *Id.*

**D. Scientific Games Performs Its Own Suitability Investigation of Sylebra**

In the midst of the Pennsylvania Regulator's investigation, in May 2017, the Company sent a letter requesting that Sylebra provide the Company with the same information it was providing to the Pennsylvania Regulator.[47] The requested information included a list of Sylebra's limited partner investors, a list of companies affiliated with Sylebra, a list of jurisdictions in which Sylebra is regulated and a list of companies in which Sylebra is invested.[48] The Company explained that it sought this and other information about Sylebra in order to "ensure compliance with the Bank Secrecy Act and anti-money laundering requirements within the gaming industry."[49]

Sylebra responded to the Company's requests by providing both detail regarding "how Sylebra's fund administrator applied industry-standard KYC and AML processes" to manage the fund and a breakdown of the world regions in which its investments originate.[50] Sylebra explained that confidentiality restrictions prevented it from providing more details regarding its investors but proposed that it could provide that information to the Pennsylvania Regulator without violating its

---

[47] Compl. ¶ 116.

[48] *Id.*

[49] Compl. ¶ 118.

[50] Compl. ¶ 121.

agreements with investors.[51]  The Company initially agreed that this course of action would satisfy its concerns, but later "reneged on the agreement" without explanation.[52]

## E. Scientific Games Amends Its Delaware Bylaws

Amidst growing tensions between the Company and Sylebra, the Board amended its Delaware Amended and Restated Bylaws (the "Delaware Bylaws") on June 9, 2017, to include two new provisions: Section 8.05 and Section 8.06.[53] Section 8.05 allowed the Company to invalidate the shares of any stockholder that had received a redemption notice following a determination that the stockholder was a Disqualified Holder.[54]  Section 8.06 required the Company to conduct a suitability analysis of each "Significant Stockholder," defined as any stockholder that beneficially owned 5% or more of any class of stock.[55]  In conducting such analyses, this Section authorized the Company to request "all relevant information pertaining to suitability and/or qualification."[56]

---

[51] Compl. ¶ 122.

[52] Compl. ¶¶ 122–24.

[53] Compl. ¶¶ 127, 131.

[54] Compl. ¶ 127.

[55] Compl. ¶ 131.

[56] Compl. ¶ 137.

According to Sylebra, Section 8.05 exceeded the authority provided to the Company in Article Tenth since that Delaware Charter provision "said nothing about the Company's ability to render securities held by a Disqualified Holder invalid such that it could void any transfer made by a stockholder that receives a redemption notice."[57]  As for Section 8.06, Sylebra contends this Section also conflicts with Article Tenth, since that Charter provision did not "sanction[] the investigation of stockholders who otherwise satisfied the prescribed regulations of gaming authorities."[58]  Of course, Sylebra did nothing to challenge these new bylaws at the time they were adopted.

Citing its new Delaware Bylaws, the Company sent Sylebra a letter on June 17, 2017, requesting further confidential information to facilitate the Company's "continuing qualification and suitability analysis with respect to Sylebra."[59]  As the Company's suitability investigation escalated, so did tensions between the parties.

---

[57] Compl. ¶ 128.

[58] Compl. ¶ 133.

[59] Compl. ¶ 140.

## F. Scientific Games Reincorporates in Nevada

On September 18, 2017, the Company announced its plans to enter into a merger for the purposes of reincorporating the Company in Nevada (the "Reincorporation Merger" or "Reincorporation").[60] The Company disseminated its proxy materials relating to the Reincorporation Merger (the "Proxy") on October 20, 2017.[61]

According to Sylebra, the Proxy was materially false and misleading in several respects, including that it: (i) misrepresented the Company's reasons for reincorporating in Nevada by failing to explain that the real reason for the move was to "further Perelman's campaign to harm the Sylebra Plaintiffs' investment and consolidate his power"; (ii) falsely disclosed that "the rights of stockholders under the New Charter and New Bylaws are substantially the same as under the Company's [Delaware] Charter and Bylaws"; (iii) did not discuss the Board's amendments to the Delaware Bylaws in June 2017; (iv) did not disclose that the change in the definition of Disqualified Holder was part of the Company's campaign to prompt government regulators to make adverse findings against Sylebra; and (v) masked the change in Disqualified Holder, which now allowed the Company to deem

---

[60] Compl. ¶ 144.

[61] Compl. ¶ 145.

.

15

disqualified any stockholder that might "cause . . . the imposition of any materially burdensome or unacceptable terms or conditions on any Gaming License."[62]

Sylebra also maintains the Proxy failed to highlight three important distinctions between the Delaware Charter and the to-be-enacted Nevada Amended and Restated Articles of Incorporation (the "Nevada Charter"): (i) Article Tenth (now Article VIII of the Nevada Charter) was changed to grant the Company power to look beyond the record holder to any beneficial owners when reviewing suitability; (ii) the Nevada Charter's new Article VIII also gave the Board the discretion "to take such other action, to the extent not prohibited by law, as it deems necessary or advisable to protect the Company or any of its Affiliates from the denial or loss or threatened denial or loss of any Gaming license"; and (iii) the Nevada Charter added a provision that the Company is *not* required to redeem or repurchase shares owned or controlled by a Disqualified Holder, even though delivering a redemption notice to a Disqualified Holder constituted a binding agreement on behalf of the Company to redeem.[63] In addition, the Proxy did not accurately disclose why the new Nevada Amended and Restated Bylaws (the "Nevada Bylaws") would contain a forum selection bylaw designating the courts of Clark

---

[62] Compl. ¶¶ 146–56.

[63] Compl. ¶¶ 157–62 (emphasis added); Svikhart Aff., Ex. 3 ("Nevada Charter") at 5.

16

County, Nevada as the sole and exclusive forum to litigate stockholder disputes (the "Forum Selection Bylaw").[64]

According to the Proxy, the move to Nevada was justified because "Delaware law does not afford the same substantive rights and protections under Nevada law," specifically noting that "reincorporation will result in the elimination of any liability of an officer or director for a breach of the duty of loyalty unless arising from intentional misconduct, fraud, or a knowing violation of law."[65] Importantly, the Proxy also explained that "[p]rimarily, the reincorporation merger will allow us to better align our legal domicile with our global corporate headquarters and our primary US manufacturing operations."[66]

In unanimously approving the Reincorporation Merger and recommending it to stockholders, the Board determined that the transaction "[was] advisable, fair to and in the best interests of [the] stockholders."[67] On November 27, 2017, a majority of Scientific Games' stockholders approved the Reincorporation Merger. According

---

[64] Compl. ¶ 164; Svikhart Aff., Ex. 2 ("Nevada Bylaws") at 17.

[65] Compl. ¶ 165; Svikhart Aff., Ex. 1 ("Proxy") at 5. Along these lines, the Proxy indicates that incorporating in Nevada "may help us attract and retain qualified management by reducing the risk of lawsuits being filed against the Company and its directors and officers." Proxy, at 4.

[66] Proxy, at 4.

[67] Compl. ¶ 168.

to Sylebra, the vote was a sham because the stockholders were misled by the Proxy and, therefore, did not understand that the Reincorporation was the latest salvo in Perelman's campaign to drive Sylebra out of the Company.[68] Sylebra also observes that the Reincorporation Merger would not have been approved had Perelman not voted his controlling block in favor of the transaction.[69]

## G. Scientific Games Files Suit Against Sylebra in Nevada

The Reincorporation Merger was executed on January 10, 2018.[70] In the months that followed, the Company ramped up its suitability investigation of Sylebra by peppering it with requests for confidential information while declining to explain the reasons for its requests.[71] When Sylebra's offers to explore "an amicable solution" were summarily rejected,[72] it began to question why the Company was not investigating other stockholders given that Sylebra was "in the same position as every investor that holds 5% or more of [the Company]."[73] On June 14, 2019, the day after Sylebra sent its most direct rejoinder to the Company, the Company and

---

[68] Compl. ¶¶ 169–70.

[69] Compl. ¶¶ 169–70.

[70] Compl. ¶ 171.

[71] Compl. ¶¶ 174–75.

[72] Compl. ¶¶ 176–77.

[73] Compl. ¶ 179.

Bally filed suit against Sylebra in Nevada state court to compel Sylebra's compliance with the suitability investigation under the Company's Nevada Bylaws (the "Nevada Action").[74] After its attempt to remove the Nevada Action to federal court failed, Sylebra filed this Delaware action on October 23, 2019.[75]

## H. Procedural History

In its eleven count Complaint, Sylebra primarily seeks to have this Court declare as invalid and unenforceable: (1) Sections 8.05, 8.06 and 10.01 of the Delaware Bylaws, (2) amendments to Article VIII of the Nevada Charter, and (3) the Forum Selection Bylaw.[76] Sylebra also seeks an order enjoining Defendants from depriving Sylebra of its rightful holdings in Scientific Games in breach of their fiduciary duties, which, as explained below, I interpret as effectively asking this Court to declare a number of provisions in the Nevada Charter, particularly Article VIII, unenforceable as against Sylebra.[77]

Following full briefing and oral argument on Defendants' Motion to Dismiss, Sylebra filed a Motion for Leave to File a Second Amended Complaint on July 17,

---

[74] Compl. ¶ 180.

[75] *Id.*

[76] Compl., Prayer for Relief (b).

[77] Compl., Prayer for Relief (a).

2020. Defendants oppose that motion as untimely, prejudicial and prohibited by Chancery Rule 15(aaa).

## II. ANALYSIS

The Defendants move to dismiss under both Chancery Rule 12(b)(3) for improper venue and Chancery Rule 12(b)(6) for failure to state viable claims. Because I am satisfied dismissal is mandated under Rule 12(b)(3), I will not address the merits of the claims under Rule 12(b)(6).[78] Before addressing the grounds for dismissal, I take up Plaintiffs' motion to amend.

### A. The Motion to Amend

Rule 15(a) makes clear that leave to amend pleadings "shall be freely given."[79] "Notwithstanding Rule 15(a)," however, this Court will deny leave to amend when a plaintiff fully engages on a motion to dismiss under Rule 12(b)(6) without first seeking leave to amend so that it can address the pleading deficiencies exposed in the motion.[80] In such instances, where the plaintiff elects to oppose dismissal rather than amend, the Court will consider the motion to dismiss on the merits of the

---

[78] In my view, it is best for a court dismissing on venue grounds to avoid addressing the merits of claims, lest that gratuitous analysis confound the analysis of the court where venue properly lies.

[79] Ct. Ch. R. 15(a).

[80] Rule 15(aaa) provides that "a party . . . must file an amended complaint, or motion to amend . . . no later than the time such party's answering brief . . . is due to be filed" or face dismissal with prejudice. Ct. Ch. R. 15(aaa).

pleading as addressed in the motion, and will dismiss with prejudice where warranted.[81]

Here, for reasons unclear, Sylebra filed its Motion to Amend two weeks after the hearing on Defendants' fully briefed Motion to Dismiss. The Motion to Amend comes too late and Sylebra offers no bases upon which the Court can or should excuse it from the operation of Rule 15(aaa).

Sylebra's attempt to invoke Rule 41(a) as a means to avoid dismissal with prejudice is also unpersuasive. "In order to give Rule 15(aaa) its intended scope, once the time for amendment has passed under that rule, a party-plaintiff will not be permitted to resort to Rules 41(a), 23 or 23.1 to file a 'without prejudice' dismissal of its action."[82] The Motion to Amend is denied.

## B. Sylebra's Requests for Declarations Regarding the Delaware Charter Are Moot

To the extent Sylebra implicitly or explicitly would have the Court declare that provisions within the Company's Delaware Charter or Delaware Bylaws are invalid or unenforceable, any such request faces an immediate and insoluble

---

[81] As our Supreme Court has explained, "[t]he purpose of Rule 15(aaa) [is] to curtail the number of times that the Court of Chancery [is] required to adjudicate multiple motions to dismiss the same action." *Braddock v. Zimmerman*, 906 A.2d 776, 783 (Del. 2006). "The rule is intended to conserve litigants' and judicial resources by discouraging a party from briefing a dispositive motion before filing an amended complaint." *E. Sussex Assocs., LLC v. W. Sussex Assocs., LLC*, 2013 WL 2389868, at *1 (Del. Ch. June 3, 2013).

[82] *Stern v. LF Capital P'rs, LLC*, 820 A.2d 1143, 1147 (Del. Ch. 2003).

problem—the Delaware Charter and Delaware Bylaws no longer exist.[83] They ceased governing Scientific Games the moment the Reincorporation Merger was effected. Any claim that seeks or depends upon a declaration of ongoing rights under these documents, or upon a declaration that provisions within them are invalid or unenforceable, therefore, is moot.[84]

### C. Sylebra's Complaint Implicates the Internal Affairs of a Nevada Corporation

Sylebra would also have the Court declare that certain amendments and provisions of the Company's Nevada Charter and Nevada Bylaws, including the Forum Selection Bylaw and the Nevada Charter's redemption provision, are unenforceable as to Sylebra. In doing so, Sylebra would have this Court do what this Court strongly prefers courts in other jurisdictions not do with respect to

---

[83] *See* Compl. ¶¶ 185, 204–211, 213–220.

[84] *See Mentor Graphics Corp. v. Shapiro*, 818 A.2d 959, 963 (Del. 2003) ("Mootness arises when controversy between the parties no longer exists such that a court can no longer grant relief in the matter."); *Supermex Trading Co., Ltd. v. Strategic Sols. Gp., Inc.*, 1998 WL 229530, at *9 (Del. Ch. May 1, 1998) ("The record reflects . . . those amendments have all been rescinded. Thus, I . . . will not enter any order with respect to those bylaws other than to note that they have been rescinded and to dismiss the claims with respect to them as moot for that reason."); *In re Tri-Star Pictures, Inc. Litig.*, 1990 WL 82734, at *2 (Del. Ch. June 14, 1990) ("The Court ruled that the Article Sixth claim had been mooted because the merger had eliminated that Article from Tri-Star's certificate of incorporation.").

Delaware corporations—decide matters that impact the internal affairs of a corporation chartered in another state.[85]

"The internal affairs doctrine is a long-standing choice of law principle which recognizes that only one state should have the authority to regulate a corporation's internal affairs—the state of incorporation."[86] "By providing certainty and predictability, the internal affairs doctrine protects the justified expectations of the parties with interests in the corporation."[87] While the internal affairs doctrine is, fundamentally, a choice of law doctrine, as explained by the United States Supreme

---

[85] *See, e.g.*, *Sternberg v. O'Neil*, 550 A.2d 1105, 1124–25 (Del. 1988) ("The Delaware courts and legislature have long recognized a 'need for consistency and certainty in the interpretation and application of Delaware corporation law.'") (quoting *Armstrong v. Pomerance*, 423 A.2d 174, 178 (Del. 1980)) (explaining that allowing important or novel questions of Delaware law to be resolved by other courts "might create excessive uncertainty about the meaning of the Delaware law as a result of too many forums interpreting it since there would be no certiorari process available to the Delaware Supreme Court to resolve conflicts"); *MacAndrews & Forbes Hldgs., Inc. v. Revlon, Inc.*, 1985 WL 21129, at *2 (Del. Ch. Oct. 9, 1985) ("[N]ovel and substantial issues of Delaware corporate law . . . are best resolved in a Delaware court."). *Cf. Martinez v. E.I duPont de Nemours & Co., Inc.*, 86 A.3d 1102, 1107 (Del. 2014) (observing that our Supreme Court "has recognized that novel or important issues of Delaware law are best determined by Delaware courts").

[86] *VantagePoint Venture P'rs 1996 v. Examen, Inc.*, 871 A.2d 1108, 1112 (Del. 2005); *see also In re Topps Co. S'holders Litig.*, 924 A.2d 951, 953 (Del. Ch. 2007) (noting "it is well settled that jurisdiction in any case will be declined . . . where a determination of the rights of the litigants involves regulation and management of the internal affairs of [a] corporation dependent upon the laws of [a] foreign state") (quoting *Langfelder v. Universal Labs.*, 56 N.E.2d 550 (N.Y. Ct. App. 1944)).

[87] *VantagePoint*, 871 A.2d at 1113.

23

Court, there are notions of comity and deference inherent in the doctrine that should not lightly be ignored:

> It has long been settled that a court—state or federal—sitting in one state will as a general rule, decline to interfere with, or control by injunction or otherwise, [a] corporation organized under the laws of another state but will leave controversies as to such matters to the courts of the state of the domicile.[88]

It is indisputable that the Nevada Charter and Nevada Bylaw provisions implicated by Sylebra's claims fall within the purview of the internal affairs doctrine. For example, the Company's Forum Selection Bylaw "plainly focus[es] on [matters] governed by the internal affairs doctrine and thus the law of the state of incorporation."[89] The redemption clause likewise directly affects the Company's internal affairs. That provision, in Article VIII of the Nevada Charter, allows the Board to redeem the shares of an investor it deems unsuitable.[90] This is plainly a "matter[] which [is] peculiar to the relationships among or between the corporation and its current officers, directors and shareholders."[91]

---

[88] *Rogers v. Guar. Tr. Co. of New York*, 288 U.S. 123, 130 (1933); *see also In re Topps Co.*, 924 A.2d at 958 ("Venerable authority recognizes that a chartering state's interest in promoting an efficient and predictable corporation law can be undercut if other states do not show comity by deferring to the courts of the chartering state when a case is presented that involves the application of the chartering state's corporation law.").

[89] *See Boilermakers Local 154 Ret. Fund v. Chevron Corp.,* 73 A.3d 934, 962 (Del. Ch. 2013).

[90] Nevada Charter, at 5.

[91] *McDermott Inc. v. Lewis*, 531 A.2d 206, 213 (Del. 1987).

24

In its Prayer for Relief, Sylebra asks this Court, among other relief, to (1) enjoin the Defendants from depriving Sylebra of its rightful holdings in the Company through the enforcement of the Nevada Charter and Bylaws provisions that purportedly require redemption; and (2) declare, under Delaware law, that the amendments to the redemption provisions of the *Nevada Charter* are invalid and unenforceable.[92] I would no more enter that injunction or make that declaration than I would declare that a Nevada statute was unenforceable in Nevada as a matter of Delaware law.

The application of internal affairs and comity principles is all the more appropriate here given that Sylebra seeks to prevent the Company from invoking its constitutive documents on a future date, when any resulting injury would occur in Nevada, not Delaware.[93] As Sylebra's counsel readily acknowledged during oral argument, "the real threat to [Sylebra] . . . is [Defendants] forc[ing] [Sylebra] to redeem."[94] That forced redemption has not happened yet, meaning it did not occur

---

[92] Compl., Prayer for Relief (a)–(b); *see also* Compl. ¶ 186 (asking the Court to declare that defendants breached their fiduciary duties by "approving the Nevada Charter" and "enacting the Nevada Bylaws").

[93] In other words, the financial injury to Sylebra will occur, if at all, while the Company is a Nevada corporation. This means that, at least under Delaware law, if the Company forces redemption, Sylebra will be injured in the Company's legal home, Nevada. *See Sample v. Morgan*, 935 A.2d 1046, 1057 (Del. Ch. 2007).

[94] Telephonic Oral Arg. on Defs.' Mot. to Dismiss (D.I. 53) ("Tr.") at 52.

25

prior to the Reincorporation when Scientific Games still called Delaware home. As discussed below, Scientific Games has a Forum Selection Bylaw that requires Sylebra to bring its claims in Nevada. Unless there is good reason not to enforce that bylaw, Sylebra has no business bringing its claims in this court.[95]

## D. The Nevada Forum-Selection Clause is Enforceable and Requires Dismissal

"The proper procedural rubric for addressing a motion to dismiss based on a forum selection clause is found under Rule 12(b)(3), improper venue."[96] "Although Delaware courts have, in the past, framed a forum selection clause analysis as jurisdictional in some sense, recent cases have all proceeded under Rule 12(b)(3)."[97] And, when addressing a motion under Rule 12(b)(3), "the court is not shackled to

---

[95] To be clear, Sylebra could have brought an action in this court back in 2017, when the Company was still a Delaware corporation, to enjoin the Reincorporation Merger as the product of a controlling stockholder's unlawful self-interest and an inadequate Proxy that prevented an informed stockholder vote on the transaction. It made no such claims. Now, almost three years later, with the Company firmly ensconced in Nevada, Sylebra comes to Delaware asking the Court to declare, in essence, that the Company never should have left here and, more remarkably, to declare that elements of its Nevada constitutive documents are unenforceable. If the Court were to entertain such claims, it would not only be departing from its "lane," it would be crossing the centerline into Nevada's lane.

[96] *In re Bay Hills Emerging P'rs I, L.P.*, 2018 WL 3217650, at *4 (Del. Ch. July 2, 2018) (quoting *Bonanno v. VTB Hldgs., Inc.*, 2016 WL 614412, at *5 (Del. Ch. Feb. 8, 2016)).

[97] *Id.* (quoting *Troy Corp. v. Schoon*, 2007 WL 949441, at *2 (Del. Ch. Mar. 26, 2007)).

the plaintiff's complaint and is permitted to consider extrinsic evidence from the outset."[98]

Forum selection bylaws are enforced "in the same way [Delaware] enforces any other forum selection clause."[99]  Such clauses "are presumptively valid and should be specifically enforced unless the resisting party clearly show[s] that enforcement would be unreasonable and unjust, or that the clause [is] invalid for such reasons as fraud and overreaching."[100]

The Forum Selection Bylaw provides:

To the fullest extent permitted by law, and unless the Corporation consents in writing to the selection of an alternative forum, the Eighth Judicial District Court of Clark County, Nevada, shall be the sole and exclusive forum for any actions, suits or proceedings, whether civil, administrative or investigative or that assert any claim or counterclaim (a) brought in the name or right of the Corporation or on its behalf, (b) asserting a claim for breach of any fiduciary duty owed by any director, officer, employee or agent of the Corporation to the Corporation or the Corporation's stockholders, (c) arising or asserting a claim arising pursuant to any provision of NRS Chapters 78 or 92A or any provision of the Articles of Incorporation or these Bylaws or (d) asserting a claim governed by the internal affairs doctrine. In the event that the Eighth Judicial District Court of Clark County, Nevada does not have jurisdiction over any such action, suit or proceeding, then any other state district court located in the State of Nevada shall be the sole and exclusive forum therefor and in the event that no state district court in the State of Nevada has jurisdiction over any such action, suit or proceeding, then a federal court located within the State of Nevada

---

[98] *Id.*

[99] *Chevron*, 73 A.3d at 940.

[100] *Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1146 (Del. 2010) (internal quotations omitted).

shall be the sole and exclusive forum therefor. Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 10.01.

Sylebra has advanced three reasons the Court should decline to enforce this obviously broad Forum Selection Bylaw: (1) it did not consent to the bylaw, (2) the bylaw is both unjust and unreasonable and (3) the bylaw was procured by fraud. I address each in turn.

### 1. Sylebra Consented to the Forum Selection Bylaw

Sylebra maintains it did not consent to the Forum Selection Bylaw because, at the time the Company adopted the bylaw, Sylebra had no ability to sell its shares.[101] This argument rests on a flawed reading of Delaware law. The ability of a board of directors of a Delaware corporation "to adopt binding bylaws" is "an essential part of the contract stockholders assent to when they buy stock."[102]

---

[101] Sylebra also argues it could not consent because, at the time of Reincorporation, the Forum Selection Bylaw would have been unlawful under Section 115 of the DGCL. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss Pls.' Compl. ("PAB") (D.I. 32) at 49–51; Tr. at 40. This argument is difficult to follow. While it is true Section 115 would have prevented Scientific Games from prohibiting its stockholders from bringing certain claims in Delaware while the Company was incorporated in Delaware, the Company *was not incorporated in Delaware* when it adopted the Forum Selection Bylaw. That clause exists in the Nevada Bylaws. Accordingly, Section 115 does not apply here.

[102] *Chevron*, 73 A.3d at 940; *City of Providence v. First Citizens BancShares, Inc.*, 99 A.3d 229, 240 (Del. Ch. 2014), *superseded on other grounds by statute*, 8 *Del. C.* § 115; *see also* Delaware Charter, at Art. Sixth ("In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, alter or repeal the Bylaws of the corporation.").

According to Sylebra, even if it implicitly consented to the Board unilaterally enacting bylaws when it invested in the Company, it did so with the understanding that it could sell its shares at any time. If that, in fact, was Sylebra's understanding, it was mistaken both as a matter of Scientific Games' governance and as a matter of law.

*First*, upon investing in the Company, Sylebra knew that it was subject to Article Tenth, which, among other things, required securities in the corporation to "be held subject to the suitability standards, qualifications, and requirements of the Gaming Authorities."[103] These standards expressly included suitability standards, which are subject to enforcement by gaming regulators in each of the jurisdictions where Scientific Games operates.[104] And with enforcement comes restrictions, including restrictions on the sale of Company securities.[105]

*Second*, the link Sylebra attempts to draw between the ability of a stockholder to sell its shares and that stockholder's consent to the corporation's bylaws finds no support in our law. In *Strougo v. Hollander*, a case Sylebra relies upon, the court deemed a fee-shifting bylaw inapplicable to the plaintiff because "a former

---

[103] Compl. ¶ 71; Delaware Charter, at Art. Tenth.

[104] 32 V.I CODE R. § 444-1.10 ("It shall be the continuing duty of all applicants and licensees to provide full cooperation to the Commission in the conduct of such inquiry or investigation.").

[105] Compl. ¶ 86.

stockholder is not subject to . . . any bylaw amendments adopted *after* one's interest in the corporation has been eliminated."[106]  There, the plaintiff was no longer a stockholder in the company when the company adopted the bylaw at issue and, therefore, was not subject to that bylaw.  That, of course, is not this case; Sylebra was (and still is) a stockholder when the Forum Selection Bylaw was adopted.[107] Sylebra has not cited any authority, and I am aware of none, supporting the proposition that when a stockholder is temporarily unable to sell its stock, that stockholder's consent to current or newly enacted bylaws, by operation of that circumstance, is somehow withdrawn.  And I can see no reason why that should be our law.[108]

## 2. The Forum Selection Bylaw Is Not Unreasonable or Unjust

Having determined that Sylebra consented to the Forum Selection Bylaw, I turn next to whether the bylaw is invalid because its enforcement would be

---

[106] 111 A.3d 590, 598 (Del. Ch. 2015) (emphasis in original).

[107] *See id.* ("[T]he bylaw cannot apply to Plaintiff, who was no longer a stockholder of the Company when the Bylaw was adopted.").

[108] This is especially so here, where the restriction was a feature of Scientific Games' governance structure when Sylebra invested in the Company, and Sylebra knew, given MacAndrews & Forbes' controlling stake, that no organic movement of stockholders was likely to alter the charter or bylaw provision that implemented the focus on investor suitability.

"unreasonable and unjust."[109]  "Courts should assess the reasonableness of a forum selection clause on a case-by-case basis."[110]  To escape the reach of the Forum Selection Bylaw on grounds that it is unreasonable or unjust, Sylebra "bears a heavy burden" to demonstrate that enforcement here would "place [it] at an unfair disadvantage" or "otherwise deny [it its] day in court."[111]  Sylebra has not carried that burden.

Sylebra begins its "unreasonableness" argument by observing that the timing of the wrongdoing "can be relevant to enforcement of a forum-selection bylaw."[112]  In support of this proposition, Sylebra points to non-Delaware authority, *Galaviz v. Berg* and *In re Facebook*, where the courts, purportedly applying Delaware law, held that a forum selection clause will be deemed unenforceable when it was "adopted by the directors who are defendants in this action, after the majority of the purported wrongdoing is alleged to have occurred."[113]  If that, in fact, is the holding of these cases, then they have misstated our law.[114]  To reiterate, a stockholder in a Delaware

---

[109] *Ingres*, 8 A.3d at 1146.

[110] *Id.*

[111] *Capital Gp. Cos., Inc. v. Amour*, 2004 WL 2521295, at *6 (Del. Ch. Nov. 3, 2004).

[112] PAB at 44.

[113] *Id.*; *Galaviz v. Berg*, 763 F. Supp. 2d 1170, 1174 (N.D. Cal. 2011); *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 922 F. Supp. 2d 445, 459–63 (S.D.N.Y. 2013).

[114] *See First Citizens*, 99 A.3d at 242 n.54 ("[T]he *Galaviz* and *Triquint* decisions, to the extent they purport to apply Delaware law, are based on a misapprehension of Delaware

31

corporation gives consent to be bound by current and future bylaws when it buys stock.[115] Whether or not the alleged wrongdoing comes before or after the adoption of a forum selection bylaw is irrelevant in determining the reasonableness or overall enforceability of the bylaw.[116]

Sylebra next argues that, "enforcement would be unreasonable where the Amended Complaint specifically alleges a years-long scheme aimed at the Sylebra Plaintiffs' investment, an essential component of which was the forum-selection bylaw issue."[117] This argument attempts to answer the wrong question. As the

---

law regarding the facial validity and as-applied analysis of forum selection bylaws."); *id*. at 241 ("[The] contention that the Forum Selection Bylaw cannot be enforced because it seeks to regulate the forum for asserting claims that arose before it was adopted is unpersuasive."); *Chevron*, 73 A.3d at 956 ("[T]he conclusion reached by the United States District Court for the Northern District of California in *Galaviz v. Berg . . .* that board-adopted bylaws are not like other contracts because they lack the stockholders' assent—rests on a failure to appreciate the contractual framework established by the DGCL for Delaware corporations and their stockholders.").

[115] *Id.*

[116] *Id.*

[117] PAB at 43–44; Compl. ¶¶ 81–170. As a branch of this argument, Sylebra claims that the Forum Selection Bylaw was adopted via a misleading Proxy and "in furtherance of the campaign targeting Sylebra and the Sylebra Plaintiffs' investment," making the Forum Selection Bylaw itself unjust and unreasonable. If ever this argument were to carry any persuasive force, that time would have been before the stockholder vote on the Reincorporation Merger. Scientific Games has been chartered as a Nevada corporation for almost three years now operating in accordance with the Nevada Charter and Nevada Bylaws. The argument that enforcement of one of the Nevada Bylaws is unreasonable because the stockholders, way back when, were not fully informed when they approved the transaction that created the bylaw is not persuasive.

Defendants properly note, in determining whether a stockholder has met his burden to demonstrate unreasonableness in Delaware, the fundamental inquiry is whether the stockholder has alleged "well-pled facts calling into question the integrity" of the court chosen in the forum selection bylaw, or "explain[ed] how the defendants have advanced their 'self-interests' by having the claims . . . adjudicated in those courts instead of a Delaware court."[118] Sylebra has not alleged, likely because it cannot allege, either fact.

The best Sylebra can muster is an allegation that Nevada state courts are accustomed to "only holding fiduciaries accountable for 'intentional misconduct, fraud or a knowing violation of the law."[119] That generalized (and unsupported) characterization of the Nevada courts' orientation is a far cry from raising a legitimate question regarding the integrity or competency of the Nevada courts to provide Sylebra "its day in court."[120]

As noted, the determination of unreasonableness is contextual.[121] The gravamen of Sylebra's claim is that Company fiduciaries, including a controlling stockholder and a supine Board, intend to deem Sylebra unqualified to own stock in

---

[118] *First Citizens*, 99 A.3d at 241.

[119] Compl. ¶ 166 (quoting Proxy at 5); PAB at 46.

[120] *Capital Gp. Cos., Inc.*, 2004 WL 2521295, at *6.

[121] *Ingres*, 8 A.3d at 1146.

Scientific Games and then force it to redeem its Scientific Games shares at an unfair price.[122] That scheme, assuming it is in progress as alleged, has not come to fruition. When (or if) it does, the fiduciaries involved will owe duties to a Nevada corporation and its stockholders. And the claims will be subject to a Nevada Forum Selection Bylaw. Nevada courts are now, and will be, available to Sylebra to adjudicate its claims, even if those claims, in some measure, implicate Delaware law. Enforcing the Forum Selection Bylaw will not change that.[123]

Any attempt to find unreasonableness in the fact that the statute of limitations in Nevada may have run on some of Sylebra's claims would also be unavailing.[124] Defendants filed the Nevada Action on June 19, 2019, providing Sylebra nearly an entire year to file counterclaims or a separate action in the jurisdiction prescribed by

---

[122] Compl. ¶ 6.

[123] *See First Citizens*, 99 A.3d at 241 ("The conduct of the FC North Board in approving the proposed merger will not be absolved from judicial review; that review simply must occur in a North Carolina court."); *Chevron*, 73 A.3d at 960 ("[T]he forum selection bylaws only regulate *where* a certain set of claims, relating to the internal affairs of the corporation and governed by the law of the state of incorporation, may be brought, not *what* claims." (emphasis in original)).

[124] Tr. at 69. *See* Helen Hershkoff & Marcel Kahan, *Forum-Selection Provisions in Corporate "Contracts"*, 93 WASH. L. REV. 265, 300 (2018) ("Red flags ought to be raised if the selected forum has, relative to the state of incorporation, a statute of limitations for corporate disputes that may bar an asserted claim."). I note that I make no finding here regarding whether *vel non* the statute of limitations bars any of Sylebra's claims since that issue may be presented to a Nevada court.

the Forum Selection Bylaw.[125]   Instead, Sylebra chose to double down on its disregard of the Forum Selection Bylaw, electing to file in Delaware, file nothing in Nevada (even prophylactically) and then wait for the ruling on Defendants' motion to dismiss, where the showcase argument is that Sylebra has filed in the wrong forum.  Under these circumstances, I cannot conclude that enforcement of the Forum Selection Bylaw would be unreasonable or unjust.

### 3. The Forum Selection Bylaw Was Not Procured by Fraud

Sylebra next argues that the Forum Selection Bylaw was procured by fraud because it "was enacted as part of the scheme to benefit Perelman and shield Defendants from liability for targeting and destroying the Sylebra Plaintiff's investment."[126]  The *prima facie* elements of fraud are well settled:

> (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[127]

---

[125] Compl. ¶ 180; Tr. at 69 (explaining that the expiration of the statute of limitations for one of Sylebra's earliest claims was June 9, 2020).

[126] PAB at 45.

[127] *Abry P'rs V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

According to Court of Chancery Rule 9(b), all averments of fraud "shall be stated with particularity."[128] To meet the particularity requirement, Rule 9(b) often will require a plaintiff making a fraud claim to allege: "the time, place, and contents of the false representation, the identity of the person(s) making the representation, and what he intended to obtain thereby."[129]

As a preliminary matter, I note that Sylebra has not pled a fraud claim, either with respect to the Forum Selection Bylaw or otherwise. Moreover, even if Sylebra had attempted to plead that the Reincorporation Merger was procured by fraud, that would be irrelevant in determining whether the Forum Selection Bylaw itself was procured by fraud. If the Forum Selection Bylaw is valid and enforceable in its own right, then whether there was fraud associated with the Reincorporation Merger (again, not pled here) is a matter for the Nevada court to decide.

As for the Forum Selection Bylaw, the Proxy notes that "Delaware law does not afford the same substantive rights and protections under Nevada law" such that

---

[128] Ct. Ch. R. 9(b); *see also Composite Hldgs. v. Westinghouse Elec. Corp.*, 992 F. Supp. 367, 369 (S.D.N.Y. 1998) ("Rule 9(b) requires that allegations of fraud with respect to a forum selection clause—just as any other allegations of fraud—be made with particularity.").

[129] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003); *see also Trenwick Am. Litig. Tr. v. Ernst & Young LLP*, 906 A.2d 168, 207–08 (Del. Ch. 2006) (Strine, V.C.), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) (noting that the relevant factors include "the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation").

the "reincorporation will result in the elimination of any liability of an officer or director for a breach of the duty of loyalty unless arising under intentional misconduct, fraud or a knowing violation of the law."[130] The Proxy then makes clear that the Company intends to adopt the Forum Selection Bylaw once chartered in Nevada, which would dictate where stockholders could bring claims against Scientific Games fiduciaries.[131] Indeed, the proposed Nevada Bylaws were attached to the Proxy.[132] Sylebra has not pled any basis to infer fraud in the adoption of the Forum Selection Bylaw from these disclosures or otherwise.[133]

---

[130] Compl. ¶ 165; Proxy, at 4–5; PAB at 46.

[131] Compl. ¶ 167; Proxy, at 9.

[132] Proxy, at 6; Proxy, at Annex C.

[133] *Abry*, 891 A.2d at 1050 (holding that fraud requires proof of a "falsely represented or omitted fact[] that the defendant had a duty to disclose"). Sylebra further argues that the Forum Selection Bylaw might not apply to MacAndrews & Forbes or Bally. PAB at 51 n.13. Here again, Sylebra misstates our law. A party "closely-related" to a signatory of a contract containing a forum selection clause can enforce the clause if that enforcement is foreseeable. *Ashall Homes Ltd. v. ROK Entm't Gp. Inc.*, 992 A.2d 1239, 1249 (Del. Ch. 2010). As Defendants properly point out, the cases Sylebra cites to question the vitality of the closely-related test actually apply the test to decide the case. *See, e.g.*, *Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at *1 (Del. Ch. Sept. 18, 2019) ("In the end, the explication is largely academic, because the plaintiff fails to plead facts sufficient to satisfy the closely-related test even under its broad formulation of the foreseeability inquiry."). Here, MacAndrews & Forbes is the Company's largest stockholder and Bally is one of the Company's wholly-owned subsidiaries; both are inextricably tied to the Company, making it entirely foreseeable that stockholder claims against both would be subject to the Forum Selection Bylaw. Compl. ¶¶ 16, 26, 29, 30–39, 95; *see also Weygandt v. Weco, LLC*, 2009 WL 1351808, at *5 (Del. Ch. May 14, 2009) ("Several cases suggest that when a control person agrees to a forum, it is foreseeable that the entities controlled by that person which are involved in the deal will also be bound to that forum."). The fact that Sylebra relegates its "closely-related" argument to a footnote in its brief suggests that

37

* * * * *

Sylebra has failed to carry its "heavy burden" to demonstrate that the Forum Selection Bylaw is unenforceable. That clause mandates that the parties litigate their disputes in Nevada. Because I am satisfied that the Forum Selection Bylaw is controlling, I need not, and elect not to, decide whether this action is subject to dismissal under the *McWane* doctrine or for failure to state a claim upon which relief may be granted.[134]

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. Plaintiffs' claims are subject to Scientific Games' Forum Selection Bylaw and must be brought in the Nevada court identified in that bylaw.

**IT IS SO ORDERED.**

---

it is not serious in its suggestion that the Court, on this record, should ignore or reject a well-established aspect of our forum selection jurisprudence. *See In re Asbestos Litig.*, 2015 WL 5016493, at *4 (Del. Super. Ct. Aug. 31, 2015) (noting that a party's "relega[tion]" of an argument to a footnote in its brief suggested more of "an attempt to preserve it" than to advance it for serious consideration).

[134] *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*, 263 A.2d 281, 283 (Del. 1970); Ct. Ch. R. 12(b)(6).